**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8  ALFRED E. FERNANDES,                    No. C 08-5091 MHP (pr)
9              Petitioner,                 **ORDER DENYING HABEAS PETITION**
10        v.
11 ROBERT L. AYERS, warden,
12             Respondent.
   _____/
13
14                    **INTRODUCTION**
15        Alfred E. Fernandes, an inmate at San Quentin State Prison, filed this <u>pro se</u> action
16 seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now before the court
17 for consideration of the merits of the <u>pro se</u> habeas petition.  For the reasons discussed
18 below, the petition will be denied.
19                    **BACKGROUND**
20        Fernandes was convicted in Contra Costa County Superior Court of second degree
21 murder while armed with a deadly weapon, and was sentenced in 1983 to 16 years to life in
22 prison.  His habeas petition does not challenge his conviction but instead challenges a
23 September 27, 2007 decision by the Board of Parole Hearings ("BPH") that found him not
24 suitable for parole.  The BPH identified the circumstances of the commitment offense,
25 Fernandes' history of criminality, ongoing concerns about Fernandes' substance and alcohol
26 abuse, and his lack of parole plans in California as the reasons for finding him unsuitable.
27
28

1   Fernandes sought relief in the California courts.  The Contra Costa County Superior

2   Court denied his petition for writ of habeas corpus in a reasoned decision.  The California

3   Court of Appeal and California Supreme Court summarily denied his petitions for writ of

4   habeas corpus.

5   Fernandes then filed his federal petition for a writ of habeas corpus.  The court found

6   cognizable his claim that his right to due process was violated because the evidence was

7   insufficient to support the BPH's decision that he was unsuitable for parole.  Respondent

8   filed an answer and Fernandes filed a traverse.

9   **JURISDICTION AND VENUE**

10   This court has subject matter jurisdiction over this habeas action for relief under 28

11   U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

12   action concerns the execution of the sentence of a prisoner housed at a prison in Marin

13   County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

14   **EXHAUSTION**

15   Prisoners in state custody who wish to challenge collaterally in federal habeas

16   proceedings either the fact or length of their confinement are required first to exhaust state

17   judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

18   highest state court available with a fair opportunity to rule on the merits of each and every

19   claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

20   dispute that state court remedies were exhausted for the claim asserted in the petition.

21   **STANDARD OF REVIEW**

22   This court may entertain a petition for writ of habeas corpus "in behalf of a person in

23   custody pursuant to the judgment of a State court only on the ground that he is in custody in

24   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

25   The petition may not be granted with respect to any claim that was adjudicated on the merits

26   in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

27   was contrary to, or involved an unreasonable application of, clearly established Federal law,

28   as determined by the Supreme Court of the United States; or (2) resulted in a decision that

2

was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for

offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The

regulation also provides that "[t]he panel shall first determine whether the life prisoner is

suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be

found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §

2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.

Code Regs. § 2402(b).

        The regulations contain a matrix of suggested base terms for several categories of

crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

depending on some of the facts of the crime.  The statutory scheme places individual

suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to

ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is

not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal.

Code Regs. § 2403(a).

        The "Penal Code and corresponding regulations establish that the fundamental

consideration in parole decisions is public safety . . . [T]he core determination of 'public

safety' under the statute and corresponding regulations involves an assessment of an inmate's

current dangerousness."  In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in

source).  Where "evidence of the inmate's rehabilitation and suitability for parole under the

governing statutes and regulations is overwhelming, the only evidence related to unsuitability

is the gravity of the commitment offense, and that offense is both temporally remote and

mitigated by circumstances indicating the conduct is unlikely to recur, the immutable

circumstance that the commitment offense involved aggravated conduct does not provide

'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to

public safety." Id. at 1191 (emphasis in source).

1  B.      Federal Habeas Relief On Parole Denial Claims

2          The U. S. Constitution's Due Process Clause does not itself provide state prisoners

3  with a federal right to release on parole.  Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir.

4  2010) (en banc).  The substantive law of a state might create a right to release on parole,

5  however.  See id. at 555, 559.  Although Hayward purported not to reach the question

6  whether a California's substantive law created a federally protected liberty interest, see id. at

7  562, later cases from the Ninth Circuit have said or assumed it does.  See Pearson v. Muntz,

8  606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that

9  may be enforced as a matter of federal law. . . .  By holding that a federal habeas court may

10  review the reasonableness of the state court's application of the California 'some evidence'

11  rule, Hayward necessarily held that compliance with the state requirement is mandated by

12  federal law, specifically the Due Process Clause." ); Cooke v. Solis, 606 F.3d 1206, 1213

13  (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts'

14  application of the 'some evidence' requirement are cognizable on federal habeas review under

15  AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty

16  interest created by California's 'some evidence' requirement"); see also Pirtle v. California

17  Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme

18  gives rise to a cognizable liberty interest in release on parole.'  McQuillion v. Duncan, 306

19  F.3d 895, 902 (9th Cir 2002).  That liberty interest encompasses the state-created

20  requirement that a parole decision must be supported by 'some evidence' of current

21  dangerousness. Hayward [603 F.3d at 562-63.]")   Hayward's application and these later

22  cases make it clear that in the Ninth Circuit there is federal habeas relief available under §

23  2254 for California prisoners denied parole without sufficient evidence, although it now

24  appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

25          A federal district court reviewing a California parole decision "must determine

26  'whether the California judicial decision approving the governor's [or the Board's] decision

27  rejecting parole was an 'unreasonable application' of the California 'some evidence'

28  requirement, or was 'based on an unreasonable determination of the facts in light of the

5

1   evidence.'" <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That

2   requirement was summarized in <u>Hayward</u> as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶]  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

9   <u>Hayward</u>, 603 F.3d at 562 (footnotes omitted) (quoting <u>Lawrence</u>, 44 Cal. 4th. at 1210, 1213-

10  14); <u>see also</u> <u>Cooke</u>, 606 F.3d at 1216 (describing California's "some evidence"

11  requirement).

12      When a federal court considers a habeas case directed to a parole decision, the

13  "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state

14  courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. §

15  2254(d)(2) for whether the decision was "based on an unreasonable determination of the

16  facts in light of the evidence."  <u>Cooke</u>, 606 F.3d at 1214 (citing <u>Hayward</u>, 603 F.3d at 563).

17  C.    <u>Fernandes' Case</u>

18         1.    <u>His Circumstances</u>

19         <u>Commitment offense</u>: The murder was described in the board report, which the BPH

20  commissioner read into the record.

> On September 3, 1982, the victim Michael Figueroa and Fernandes were at the Starlight Room, a local bar.  Figueroa ran into Mrs. Mikesell, a female that he met at the bar three days earlier and invited her to his apartment and "do [s]ome coke."  Ms. Mikesell agreed to go as long as she could bring her friend.  Fernandes, Figueroa, Ms. Mikesell, and a friend all went to the apartment, drank beer and snorted cocaine in his apartment.  They then returned to the Starlight Room, danced and drank more beer.  They went to Hobie's (phonetic) Roadhouse in Concord and each drank three cocktails.  Ms. Mikesell's friend left.  Ms. Mikesell, Fernandes, and Figueroa left the Roadhouse, bought two six-packs of beer and a small bottle of brandy and returned to the apartment.  They drank some more beer and talked for about 45 minutes.  Ms. Mikesell went to the bathroom.  Upon returning from the bathroom, she heard the defendant Fernandes and the victim, Figueroa, talking about Mr. Figueroa leaving the apartment.  Figueroa drank several more beers and then left the apartment.  After about one half an hour, Figueroa returned to the apartment and banged on the front door.  Fernandes opened the door and Figueroa entered the apartment and sat on the couch.  Figueroa seemed to be angry.  Fernandes tried to calm him down.  Fernandes

6

and Figueroa then began arguing and fighting over Figueroa living in the apartment at no expense.  The fight began inside the apartment and carried on outside the apartment.  Eventually, Fernandes went back inside the apartment and retrieved a butcher knife with a blade between eight and ten inches in length.  He made a statement that he was going to "get" or "kill" Figueroa.  Then went back outside.  Fernandes circled Figueroa thrusting the knife at him.  Figueroa slapped at Fernandes' arm and Fernandes lunged at Figueroa, stabbing him in the chest.  Fernandes was arrested by the Concord Police Department and Figueroa was transported to Mount Diablo Hospital where he died.  Death was determined to be from hemorrhaging caused by stab wounds to the heart and liver.

Pet. Exh. A, 9/27/07 BPH hearing reporter's transcript ("RT") 15-17.

Criminal History: Before the murder in 1982, Fernandes had a criminal record. Fernandes was arrested for assault in 1968 and was sent to juvenile hall for thirty days; was arrested for breaking and entering a motor vehicle in 1971 and received a suspended sentence plus some time in county jail; was arrested in 1972 or 1973 for possession of narcotics for trafficking and received probation; was arrested in 1975 for possession/distribution of marijuana and received probation; and was arrested in 1973, 1974, and 1975 for operation of a motor vehicle without a license and was fined in each case; and was arrested in 1977 for conspiracy to commit larceny over $100.  RT 33-40.  Fernandes was 29 years old when he committed the murder in 1982 and was 54 at the time of the hearing.  RT 78, 83.

Post-Incarceration Behavior - The Positives: Fernandes had been in Alcoholics Anonymous since 1990 and in Narcotics Anonymous since 1992 and was still attending meetings at the time of the parole hearing.  RT 44.  He had taken numerous self-help classes. He had taken FEMA courses.  He had obtained his GED in prison and later earned his Associate's degree in 1990.  He had developed vocational skills: he had obtained a certification in 1986 that qualified him to service airplane engines; he had obtained his forklift operator's license; and he had obtained certificates in wood working skills.  He also received positive job reviews.

Post-Incarceration Behavior - The Negatives: Fernandes had received eight CDC-115 serious rule violation reports.   He received CDC-115s for fighting (1986), possession of stimulants and sedatives (1987), possession of another inmate's TV (1988), control of hashish marijuana (1989), possession of stimulants and sedatives (1989), refusal to submit to drug urinalysis testing (1996), and possession of hypodermic syringes (2003).  RT 51.  As to the

7

1   hypodermic needles, Fernandes claimed he had taken responsibility for something that was

2   actually his cellmate's, RT 54, but the commissioners were skeptical of that story.

3         Fernandes had received seven CDC-128s for lesser transgressions.  The details of the

4   CDC-128s were not mentioned at the hearing except that it was mentioned that the last one

5   was in December 2006 for contraband.  RT 51, 81.

6         Psychological Evaluations: The August 19, 2005 psychological evaluation indicated

7   that Fernandes had alcohol and substance abuse concerns.   The psychologist wrote that

8   Fernandes "'does not believe that he has a problem with addiction to substances.'"  RT 53

9   (quoting 8/19/05 mental health evaluation, p. 2).  The psychologist listed Axis I diagnostic

10  impressions as "alcohol abuse in controlled environment and cocaine abuse in controlled

11  environment."  RT 56.  The diagnosis was not abuse "in remission" in a controlled

12  environment, but instead was abuse in a controlled environment.  RT 81.  The psychologist

13  gave Fernandes an overall rating of being at low risk for engaging in violent behavior in the

14  community, RT 57, but this rating was contingent on him abstaining from alcohol and drugs.

15  The psychologist observed that "'the greatest risk factor in Mr. Fernandes' situation is

16  exposure to alcohol and/or drugs.'"  RT 57-58.

17        There also was a psychological report from 2003 that was consistent with the 2005

18  report, and also noted the risk associated with alcohol for Fernandes: "'Alcohol use, even in

19  moderation is associated with reduced impulse control and would be associated with

20  increased risk of violence in an inmate who has killed another person while intoxicated,

21  whether in self-defense or not.'" RT 59-60.

22        Notwithstanding the psychological evaluations indicating a major concern with

23  substance abuse, Fernandes did not believe he had a substance abuse problem. RT 54-56.  He

24  claimed that he did not want to say he had a drug problem at the time he committed the

25  murder because that would be trying to make an excuse for his activities.  RT 55-56.  He

26  claimed that he hadn't smoked marijuana in 20 years, RT 54, which was at odds with the

27  disciplinary write-ups for drug-related activities.  Fernandes also did not know how long he

28  had been clean and sober or the various steps in the 12-step program despite the fact that he

8

1    had attended A.A. and N.A. since 1990 and 1992. RT 61-62.    Fernandes also claimed that

2    he had refused to submit to a urinalysis because he was concerned about a potential false

3    positive result.  RT 63-64.

4        Parole Plans: Fernandes had not made plans for a residence or job in California.   He

5    had offers of support with his family in Massachusetts, although he apparently could not be

6    ordered released to the state of Massachusetts and needed to request a transfer of his parole

7    to that state.  RT 66.   As to parole plans in California, Fernandes apparently only had a

8    brochure from one re-entry services program.  See RT 66-67.  He said he had sent out letters

9    about opportunities but the usual response received was that he had to be released before any

10   of the recipients could possibly provide any offer or consider him for a job.  RT 67-68.

11       2.   BPH's Decision And State Court Review

12       The BPH determined that Fernandes was "not yet suitable for parole" and "would

13   impose (sic) an unreasonable risk of danger to society or a threat to public safety if released

14   from prison."  RT 79.  The BPH relied on the commitment offense, which was "carried out in

15   an especially cruel and callous manner,"  RT 79, and in a "dispassionate and calculated

16   manner," RT 80, and was done for a trivial motive.  The BPH also relied on Fernandes' prior

17   criminality.  RT 80.  The BPH also relied on his mixed institutional behavior, which "has

18   been excellent programming in some ways and in some ways it's been lacking."  RT 80.

19   The BPH noted that he had eight CDC-115s, including one in 2003 for possession of

20   hypodermic syringes.   Finally, the BPH relied on the fact that Fernandes had no parole plans

21   in California beyond having obtained some brochures for transition programs.  RT 82.  The

22   panel recognized that he did have marketable skills, however.  RT 82.

23       The BPH commissioner summed up the concerns with some very helpful comments to

24   Fernandes.  See RT 84-85.  The commissioner explained that some of Fernandes' statements

25   gave them serious concern about Fernandes' judgment.  RT 85.  For example, Fernandes'

26   claim that he had taken responsibility for another inmate's possession of hypodermic needles

27   in 2003 was "hard to believe" and, if true, was in some ways "just plain stupid" since he must

28   have known how it would affect his parole chances.  RT 85.  Fernandes' affect was "obtuse,"

1   he appeared to have bad judgment currently, and gave the panel the impression that "you

2   could get a job today and lose it tomorrow because you tell the guy off at some point or you

3   just go off and that's the impression that you're giving." RT 85, 86.   The commissioner

4   urged Fernandes to try to be more reflective in his thoughts and statements.

5          The Contra Costa County Superior Court found that the finding of parole unsuitability

6   was "supported by the quantum of evidence required under the 'some evidence' standard

7   established by the California Supreme Court." Resp. Exh. 3 at Exh. B, p. 2.  As the last

8   reasoned decision from a state court, that is the decision to which § 2254(d) applies.  See Ylst

9   v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92

10  (9th Cir. 2005).   The superior court explained that the BPH "did not rely exclusively upon

11  the nature of the commitment offense," and relied also upon Fernandes' prior criminality,

12  lack of California parole plans, failure to "fully come to terms with the substance abuse

13  problem which had played a role in the commitment offense," and "mixed" institutional

14  behavior – all of which had support in the record.   Resp. Exh. 3 at Exh. B, pp. 4-5.  The

15  factors relied on "are relevant to assessing the risk of danger petitioner would pose if released

16  and each provided some evidence to support the Board's finding."  Id. at 5.

17          3.   Analysis Of Habeas Claim

18          Before turning to the sufficiency of the evidence question, the court addresses two

19  separate arguments from Fernandes.  First, he argues that the list of suitability factors in 15

20  Cal. Code Regs. § 2402(c) is "intolerably vague" because the BPH habitually determines

21  every crime to be "exceptional" under § 2402(c)(1). Petition, pp. 14, 16.  The BPH found his

22  crime to have been "carried out in an especially cruel and callous manner," RT 79, and that

23  finding fits with § 2402(c)(1)'s language that a crime committed "in an especially heinous,

24  atrocious or cruel manner" tends to indicate unsuitability.  The latter phrase is apparently the

25  phrase to which Fernandes' challenge is directed.  The regulation provides a list of five

26  factors to consider when determining whether a crime is "especially heinous, atrocious or

27  cruel," including the presence of multiple victims, the abuse or mutilation of the victim and a

28  trivial motive for the crime.  See 15 Cal. Code Regs. § 2402(c)(1)(A)-(E).  The term

10

1   "especially heinous, atrocious, or cruel," as further limited by five detailed factors/sub-

2   definitions, is not unconstitutionally vague.  Cf. Arave v. Creech, 507 U.S. 463, 470-78

3   (1993) (Idaho death penalty statute citing as an aggravating factor crimes carried out in an

4   "utter disregard for human life" was not impermissibly vague because limiting construction

5   had been adopted which defined factor as those crimes demonstrating "the utmost disregard

6   for human life, i.e., the cold-blooded pitiless slayer").  "The Due Process Clause does not

7   require the same precision in the drafting of parole release statutes as is required in the

8   drafting of penal laws."  Hess v. Board of Parole and Post-Prison Supervision, 514 F.3d 909,

9   913-14 (9th Cir. 2008).

10       The murder committed by Fernandes fit two of the regulation's criteria for determining

11   that a murder was committed in an especially heinous, atrocious or cruel manner. There was

12   evidence that it was "carried out in a dispassionate and calculated manner," § 2402(c)(1)((B),

13   in that Fernandes went back inside the apartment, retrieved a kitchen knife and announced

14   his intent to "get" or "kill" the victim before he re-emerged from the apartment and stabbed

15   the victim.  See RT 16-17.  (Although Fernandes disputed some of the details about the

16   sequence of events, the BPH was not required to accept his version of the killing.)  This

17   killing also was for an unusually "trivial" motive, § 2402(c)(1)(E), i.e., he wanted the victim

18   to move out or at least leave for the night so he could be alone with his date.   The murder

19   here certainly was not the most aggravated second degree murder, but it also was not the

20   most minimal second degree murder.  In any event, the murder was not the only reason for

21   the unsuitability finding.

22       In some parts of his argument Fernandes suggests that he was denied parole solely on

23   the basis of his commitment offense.  He misunderstands the BPH's decision.  The BPH

24   explicitly identified the circumstances of the murder, *plus* his history of criminality, his

25   mixed institutional behavior, concerns about his substance and alcohol abuse, and his lack of

26   parole plans in California as the reasons for finding him unsuitable for parole.

27       There was some evidence to support the BPH's reasons and conclusion.  It is

28   abundantly clear that parole was denied primarily because of the combination of the murder

11

1  plus the substance abuse problems.   This combination provided ample evidence to find

2  Fernandes not suitable for parole.  The killing occurred after drugs and lots of alcohol were

3  consumed.  Fernandes had a couple of drug offenses in his criminal history.  Fernandes'

4  disciplinary record reflected continued substance abuse during incarceration: he had received

5  disciplinary write-ups in 1987 and 1989 for possession of stimulants and sedatives, in 1989

6  for control of hashish marijuana, in 1996 for refusal to submit to a drug test, and in 2003 for

7  possession of hypodermic syringes.  The fact that these occurred throughout the incarceration

8  show the continuing nature of the problem, and not a problem that had been brought under

9  control.  Notwithstanding his participation in A.A. and N.A. for more than a decade,

10 Fernandes didn't know some main points that those programs stressed.  Two evaluating

11 psychologists noted strong concerns about this inmate and substance abuse issues, and noted

12 the importance of abstention from alcohol and drugs in their evaluations of his risk of future

13 violence.  Despite all this evidence pointing toward the existence of a substance abuse

14 problem, Fernandes believed that he had no problem.  The serious ongoing substance abuse

15 concerns for this inmate, when combined with the murder committed while using alcohol and

16 drugs, are facts probative to the central issue of current dangerousness when considered in

17 light of the record.

18      The information available to the BPH reasonably could be viewed to indicate "that the

19 implications regarding the prisoner's dangerousness that derive from his . . . commission of

20 the commitment offense remain probative to the statutory determination of a continuing

21 threat to public safety." Lawrence, 44 Cal. 4th at 1214.  Fernandes' lengthy incarceration, his

22 self-help and therapy programming, his educational achievements and his vocational

23 achievements count in his favor, but do not overcome the evidence that showed him to be not

24 suitable for parole.  Cf. Shaputis, 44 Cal. 4th at 1259-60 (upholding unsuitability

25 determination for prisoner who, despite favorable programming and prison behavior, still had

26 not gained insight into his domestic violence and murder of his wife).  There was some

27 evidence to support the BPH's findings on the commitment offense, prior criminality, mixed

28 institutional behavior, substance and alcohol abuse concerns, and lack of parole plans.  These

1   historic facts also provided reliable, probative evidence of Fernandes' current dangerousness.

2   The state court's rejection of Fernandes' petition was not an unreasonable application of

3   California's "some evidence" requirement and was not based on an unreasonable

4   determination of the facts in light of the evidence.  Fernandes therefore is not entitled to

5   federal habeas relief.

6          As in many parole cases, the petitioner here has not disputed the evidence behind the

7   BPH commissioners' statements during the review of the record – such as the number and

8   nature of the CDC-115s and the statements in the psychological evaluations – and instead

9   disagrees with the inferences the BPH drew based on that evidence.  It thus was possible to

10  decide the merits of the petition in this case without having the original documents in the

11  record.  In future cases, however, the parties and respondent's counsel must endeavor to put a

12  more complete record before this court.  Instead of having to rely on a BPH commissioner's

13  recitation of what various documents say, it is preferable to have the record include those

14  actual documents, such as the psychological evaluation,  the life prisoner evaluation report

15  (with its list of the disciplinary offenses), and a probation officer's report or state appellate

16  court opinion describing the commitment offense.

17  D.     Certificate Of Appealability

18         A certificate of appealability will not issue.  See 28 U.S.C. § 2253(c).  This is not a

19  case in which "reasonable jurists would find the district court's assessment of the

20  constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

21  Jurists of reason would not find debatable or wrong that the decision that the state court

22  reasonably applied California's "some evidence" requirement in upholding the denial of

23  parole, and reasonably determined the facts in light of the evidence presented.  See Hayward,

24  603 F.3d at 562-63.

25

26

27

28

13

1

**CONCLUSION**

2        For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

3   the file.

4        IT IS SO ORDERED.

5   DATED: October 8, 2010

6                                                          Marilyn Hall Patel
                                                           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NOTES**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).